FILED
IN OPEN COURT
MAY 27 2026
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA

v.

JORGE FIGUEIRA,

*Defendant*

Case No. 1:26-CR-74

STATEMENT OF FACTS

The United States and the defendant, JORGE FIGUEIRA (hereinafter, "the defendant"), agree that the following facts are true and correct, and that had this matter proceeded to trial, the United States would have proven them beyond a reasonable doubt with admissible and credible evidence:

1. From at least in or about January 2024 through at least in or about November 2025, in the Eastern District of Virginia and elsewhere, the defendant knowingly and intentionally combined, conspired, confederated, and agreed with others, both known and unknown, to commit offenses against the United States in violation of 18 U.S.C. § 1956, to wit: (1) to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, the distribution of controlled substances and conspiracy to do the same in violation of 21 U.S.C. §§ 841(a)(1) and 846, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, or control of the proceeds and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity and (2) to conduct financial transactions affecting interstate and foreign commerce, which involved property represented to be the proceeds of specified unlawful activity, that is, the distribution of controlled substances and conspiracy to do

the same, in violation of 21 U.S.C. §§ 841(a)(1) and 846, with the intent to conceal and disguise the nature, location, source, ownership, or control of property believed to be the proceeds of said specified unlawful activity, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(3)(B), and 1956(h).

2. The defendant, who resided in Miami, Florida, was a crucial member of an international money laundering conspiracy that served foreign drug trafficking organizations by gathering, laundering, and repatriating proceeds derived from the unlawful sale of controlled substances, including in the United States.

3. The object of the conspiracy was to receive proceeds from the distribution of narcotics, conceal those proceeds from detection, and then launder the proceeds.

4. The defendant and his co-conspirators profited through fees based on the amount of money involved in each financial transaction.

5. The defendant and his co-conspirators used various secretive and clandestine methods to conceal the nature, location, source, ownership, or control of the proceeds from detection. For example:

a. The defendant and his co-conspirators used encrypted communications platforms and coded language to discuss their illegal activities;

b. The defendant and his co-conspirators received bulk cash from representatives of drug trafficking organizations;

c. The defendant and his co-conspirators confirmed their authorization to collect drug proceeds from drug trafficking organization representatives by presenting verification codes, which were often serial numbers taken from U.S. or foreign currency notes;

d. The defendant and his co-conspirators used bank accounts in the United States and elsewhere to deposit and conduct financial transactions with drug proceeds;

e. The defendant and his co-conspirators used cryptocurrency wallets to deposit and conduct financial transactions with drug proceeds;

f. The defendant and his co-conspirators used a series of convoluted transactions and quick swaps between financial accounts, including both traditional bank accounts and cryptocurrency wallets, to conceal the nature, source, and control of the drug proceeds;

g. The defendant and his co-conspirators used shell companies – i.e., business entities with no significant assets or operations – to conceal the nature, source, and control of the drug proceeds;

6. At the Federal Bureau of Investigation's direction, three confidential human sources represented themselves to the defendant and his co-conspirators as individuals involved in illegal activity, including drug trafficking. The defendant and his co-conspirators conducted seven controlled monetary transactions with these confidential human sources, as set forth in the table below.

| Controlled Transaction | Date | Amount Laundered | Sent From |
|---|---|---|---|
| 1 | January 23, 2024 | $20,000 (U.S. Currency) | Company A |
| 2 | February 28, 2024 | $70,000 (U.S. Currency) | Company A |
| 3 | May 7, 2024 | $50,000 (U.S. Currency) | Company B |
| 4 | November 21, 2024 | $20,000 (USDT) | Company C |
| 5 | January 17, 2025 | $20,000 (USDT) | Company A |

| | | | |
|---|---|---|---|
| 6 | February 21, 2025 | $50,000 (USDT) | Company A |
| 7 | November 7, 2025 | $100,000 (USDT) | Company D |

7. Law enforcement initially began investigating the money laundering activities of Unindicted Co-Conspirator 1 ("UCC-1"), a major international money launderer based in Panama and Venezuela, which led to the identification of the defendant. A confidential human source ("CHS") met with UCC-1 in person in Panama City, Panama in October 2023, and later repeatedly spoke with UCC-1 by phone. Over the course of their interactions, the CHS told UCC-1 that the CHS worked with counterfeit merchandise and had money that needed to be "cleaned." UCC-1 stated he could "clean it up easily" and would send the laundered funds back to the CHS. The CHS contacted UCC-1 directly to initiate each of the first three controlled transactions.

8. For the first two controlled transactions, UCC-1 directed the CHS to another co-conspirator – Unindicted Co-Conspirator 2 ("UCC-2") – to conduct the transactions. For both these controlled transactions, the CHS went to UCC-2's place of business in Colón, Panama, where the CHS handed over U.S. currency. After both these transactions, the laundered funds, minus a previously agreed upon transaction fee, arrived in an FBI-controlled bank account from a bank account associated with COMPANY A, a company owned and operated by the defendant.

9. For the third controlled transaction, UCC-1 directed another CHS to meet an individual in Miami, Florida, where the CHS handed over U.S. currency after receiving a verification code in the form of a serial number taken from a U.S. currency note. After this transaction, the laundered funds, minus a previously agreed upon transaction fee, arrived in the FBI-controlled bank account from a bank account associated with COMPANY B, a company owned and operated by the defendant.

10. Controlled Transactions 4, 5, 6, and 7 followed a different pattern. Prior to each of these controlled transactions, a CHS contacted the defendant directly to arrange the details of the transactions, including the fees for the transactions. For Controlled Transactions 4, 5, and 6, the defendant directed the CHS to send U.S. Dollar Tether ("USDT"), a cryptocurrency, to a particular cryptocurrency wallet. For Controlled Transaction 7, the defendant put the CHS in contact with another co-conspirator, who in turn directed the CHS to send USDT to a particular cryptocurrency wallet. On each occasion, hours after the CHS sent the USDT to the cryptocurrency wallet as directed, the laundered funds, minus a previously agreed upon transaction fee, were deposited into an FBI-controlled bank account. After Controlled Transactions 4, 5, 6, and 7, the transfer that arrived in the FBI-controlled bank account was sent from COMPANY C, COMPANY A, COMPANY A, and COMPANY D, respectively, all companies owned and operated by the defendant

11. For Controlled Transactions 4, 5, 6, and 7, the cryptocurrency transaction sent from the FBI-controlled cryptocurrency wallet was initiated by law enforcement personnel located in the Eastern District of Virginia.

12. In total, the defendant and his co-conspirators laundered $330,000 of law enforcement funds.

13. The defendant and his co-conspirators profited through fees based on the amount of money involved in each financial transaction. The fees for the controlled transactions conducted with the confidential human sources ranged from less than 1% to 10%.

14. The defendant and a CHS met in person in Miami, Florida on two occasions, namely, or about September 27, 2024 and February 6, 2025. The defendant and a CHS also spoke by phone on several occasions. Over the course of these conversations, the defendant made

statements acknowledging his understanding that the funds he received – both from the CHS and from other individuals – were the proceeds of drug trafficking. For example, the defendant suggested to the CHS that, when discussing monetary transactions, they use coded language to differentiate between money obtained from drug trafficking and money obtained from legal sources. During at least two controlled transactions, the CHS used the established coded language to indicate to the defendant that the money was obtained from drug trafficking. The defendant also acknowledged that money he received from other individuals was also money obtained from drug trafficking. The defendant also made statements acknowledging his efforts to avoid detection by law enforcement.

15. The defendant also told a CHS that the defendant had a cryptocurrency wallet that was likely to reach one billion dollars in value. Law enforcement conducted blockchain analysis on the cryptocurrency wallets used in Controlled Transactions 4, 5, and 6, and identified a particular cryptocurrency wallet that was used in one of the final cryptocurrency transactions before the funds were ultimately transferred to the FBI-controlled bank account. This particular cryptocurrency wallet had received more than one billion dollars' worth of USDT and had sent approximately one billion dollars' worth of USDT but rarely maintained a significant balance.

16. The defendant also used traditional bank accounts to launder money. More than one billion dollars ($1,000,000,000.00) moved through bank accounts associated with COMPANY A, COMPANY B, COMPANY C, and COMPANY D, all companies owned and operated by the defendant. Money moved through these bank accounts in patterns consistent with money laundering, i.e., in a series of convoluted transactions, quick transfers between accounts, and a lack of outflows consistent with legitimate business payments.

17. The defendant agrees that at least one percent of the money that moved through these bank accounts – i.e., at least ten million dollars ($10,000,000.00) – was criminally derived funds.

18. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

19. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Todd W. Blanche
Acting Attorney General

Date: 5/14/2026

By: Catherine Rosenberg
Catherine Rosenberg
Edgardo J. Rodriguez
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, JORGE FIGUEIRA, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

JORGE FIGUEIRA

I am Arthur L. Wallace, III, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Arthur L. Wallace, III
Attorney for JORGE FIGUEIRA